DECISION
{¶ 1} Theresa Boyd filed this action in mandamus, seeking a writ to compel the Ohio School Employees Retirement System ("SERS") to vacate its decision denying her R.C. 3309.39 application for disability retirement and to compel SERS to enter a new decision granting her disability retirement.
 {¶ 2} In accord with local rules, this case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. *Page 2 
The magistrate then issued a magistrate's decision which contains detailed findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate's decision includes a recommendation that we deny the requested relief.
 {¶ 3} No party has filed objections to the magistrate's decision. The magistrate's decision can be adopted under these circumstances unless an error of law or other defect is apparent on the face of the magistrate's decision. See Civ.R. 53(D)(4)(e).
 {¶ 4} No error of law or other defect is evident on the face of this magistrate's decision. We, therefore, adopt the findings of fact and conclusions of law contained in the magistrate's decision, we correct a typographical error at ¶ 63 of the magistrate's decision and deny the requested relief.
 Writ of mandamus denied. BROWN and FRENCH, JJ., concur. *Page 3 
 APPENDIX A MAGISTRATE'S DECISION IN MANDAMUS {¶ 5} In this original action, relator, Theresa Boyd, requests a writ of mandamus ordering respondent, Ohio School Employees Retirement Board ("SERB"), to vacate its decisions denying her R.C. 3309.39 applications for disability retirement and to enter a decision granting her disability retirement applications. *Page 4 
Findings of Fact: {¶ 6} 1. On June 14, 2004, relator filed a disability retirement application on a form provided by the School Employees Retirement System ("SERS"). On her application, relator stated that she had been employed as a school bus driver by the Cleveland Municipal School District.
 {¶ 7} 2. With her application, relator also submitted an Attending Physician Report, a form provided by SERS. On the Attending Physician Report, relator's treating physician Jonathan Waldbaum, M.D., certified that relator "is physically and/or mentally incapacitated for a period of at least the next 12 months and is unable to perform the duty for which [she was] formerly responsible as a school employee." (Emphasis sic.) The form asks the certifying physician to list the primary disabling condition and the onset date. In response, Dr. Waldbaum wrote "low back injury" with an onset date of May 2003.
 {¶ 8} The form also asks the physician to list underlying medical conditions. In response, Dr. Waldbaum wrote: "Sacroiliac [joint] injury [and] Lumbar [degenerative disc disease]."
 {¶ 9} 3. SERS has another form captioned "Treasurer's Notification of Disability Application" which must be completed by the treasurer of the school district where the applicant is employed. The treasurer of the Cleveland Municipal School District indicated on the form that relator had worked 7.33 hours per day, five days per week as a driver. The treasurer also provided SERS with a school bus driver job description.
 {¶ 10} 4. Earlier, on January 14, 2002, relator sustained an industrial injury while employed as a school bus driver for the Cleveland Municipal School District. The *Page 5 
industrial claim is allowed for "contusion of shoulder, contusion of back, sprain lumbar
region."
 {¶ 11} 5. On March 23, 2004, relator was examined at the request of the Ohio Bureau of Workers' Compensation ("bureau") by Kevin L. Trangle, M.D. In his report, Dr. Trangle presents a history of the industrial injury:
 On the date of injury, which was 1/14/02, she apparently was washing her bus dressed in a fireman's outfit and water clothes when she went in front of the bus, slipped on the wet tile and fell backwards hitting her shoulder and back. She was seen initially at East Side Occupational Health where x-rays were negative for fracture. She was actually returned to regular work. She followed up the next day at Kaiser, which was her primary provider. She believes she missed work for a total of five days despite the fact the occupational dispensary returned her to work. Nonetheless she went back to work one week later and worked regular duty at that point in time. While on regular duty, she underwent physical therapy at Kaiser.
 In March of 2002 she apparently slipped while on the bus and re-aggravated her back problem. She was seen at that point in time and put on light duty. She remained on light duty not driving, but answering phones and doing clerical work until June of 2002. She did not work that summer. She underwent additional physical therapy while she was working light duty.
 During that summer she underwent MRI scans of her back, which were done on 7/17/02. They showed no abnormalities. There was minimal decreased signal at L4-5. She was diagnosed as having lumbar sprain and left sciatica.
 X-rays of the back were also taken and these were normal.
 The patient continued to be seen at Kaiser and continued to undergo physical therapy. She states she had at least six sessions of six weeks per session three times a week of physical therapy during the year 2002. *Page 6 
 In September of 2002 when she attempted to return to work there was no light duty and she remained off work at that point in time for approximately 8 months. She returned to light duty in April of 2003 and worked light duty and transitional work until February of this year. She has not worked in any capacity since 2/4/04. She underwent three weeks at the Cleveland Clinic of physical therapy at the end of 2003. She completed a six week two-times per week session of exercise therapy in March of this year. She has had at least three SI injections on the left side.
 She has had no further diagnostic studies beyond the one MRI scan and x-rays. She has had no EMG/NCV studies, CT scans or myelograms. Outside of the physical therapy, which has been extensive, varied and constant, she has also had use of a TENS unit and three SI injections. She has had no epidural blocks done or other intervention.
 * * *
 Having done all of this, the patient states she is somewhat better, but still has problems. She did attempt to return to driving in November of last year. When driving, she stated she was only able to last three or four hours in the bus and because of the bouncing, she had so much pain that she had to leave. Even today in driving the car she can only drive for half an hour at a time without having to get up and walk for 10 or 15 minutes. She can bend and stoop, but has difficulty with handling weights and difficulty doing this repetitively.
 * * *
 I believe she has reached the point of maximum medical improvement. She is not able to return to her former position of employment because of the amount of sitting involved as well as the amount of vibration involved. She could be in any position where she can sit or stand at will, but probably for no more than a half an hour at a time. She should be able to bend up to once every 15 minutes and handle objects weighing 20 pounds. These are her restrictions.
 {¶ 12} 6. With her application, relator submitted Dr. Trangle's March 23, 2004 report as well as office notes from Dr. Waldbaum. *Page 7 
 {¶ 13} 7. Relator's application for disability retirement benefits prompted SERS to schedule relator for an examination to be performed on August 10, 2004 by Claire V. Wolfe, M.D. Following the examination, Dr. Wolfe issued a report stating:
 History: Theresa Boyd is a 50-year old woman who worked as a school bus driver for 20 years with the Cleveland Municipal School District. She last worked February 6, 2004, when she received a notice stating that her transitional work period was ending and that there were no other jobs for her.
 Mrs. Boyd was contracted for 7 hours 40 minutes a day for driving a school bus. She usually drove for 2.5 hours in the morning, was off for 3 hours in between and then drove for another 3 hours at the end of the day. In January 2002, she fell, landing on her buttock and developing pain in her lower back, left sacroiliac joint and buttock. * * *
 * * * She tried returning to work and found that the constant sitting and vibration simply made her pain unbearable. She was off work for quite some time after the initial fall but then returned to the transitional program in April 2003 until it was terminated in February 2004. The transitional program allowed her to drive in the morning and spend the afternoon in the office. It was difficult for her, but it was at least tolerable.
 * * *
 Imaging Studies: Mrs. Boyd has had one set of X-rays and MRI in 2002 and none since. She has not had any epidurals. None of her sacroiliac joint injections were beneficial.
 * * *
 Impression: Mechanical low back pain.
 Recommendations: Mrs. Boyd's X-ray reports from 2002 were brought with her to the exam — without the actual films — and copies are enclosed for SERS. Those reports note on the plain films, "minor" DJD of the intervetebral joints and apophyseal joints of the lumbar spine with some joint space narrowing at L4-5. *Page 8 
 In July 2002, a lumbar MRI was read as normal, specifically with no annular bulges or focal protrusions, no foraminal stenosis and "minimal" signal loss in the L4-5 disc space.
 I am sure Mrs. Boyd's weight contributes to her symptoms, and I suppose some of her "mild" degenerative joint disease could contribute. However, the only studies that we have from two years ago are essentially normal. She never has had a documented neurologic abnormality in the two years of records that we have available to us. She has not responded to sacroiliac injections, nor to any medications or treatments on a sustained basis. I found her today to be a very genuine person, distressed at her current situation, needing to work and at risk of losing her home, and obviously secondarily anxious and depressed because of that. Unfortunately, on a strictly objective basis today, I cannot find an objective diagnosis that would preclude her from driving a school bus.
 {¶ 14} 8. Following the August 10, 2004 examination, Dr. Wolfe also completed a "Report of Medical Examiner," a form provided by SERS. On the form, Dr. Wolfe certified that relator "is not physically and/or mentally incapacitated for a period of at least 12 months from the dateof application and is able to perform the duty for which [she is] responsible for as a school employee." (Emphasis sic.)
 {¶ 15} 9. Pursuant to Ohio Adm. Code 3309-1-40(B), SERB appoints physicians to a medical advisory committee ("MAC") and it appoints a chairman who acts as a medical advisor to SERB. During August 2004, three MAC physicians reviewed relator's application along with all the submitted records as well as Dr. Wolfe's August 10, 2004 report. Each of the three MAC physicians authored a report addressed to chairman Edwin H. Season, III, M.D. All three physicians concurred in Dr. Wolfe's
certification that relator can return to her employment as a school bus driver. *Page 9 
 {¶ 16} 10. By letter dated September 10, 2004, Dr. Season informed the SERS "retirement committee" that MAC recommends that relator's disability retirement application be denied.
 {¶ 17} 11. By letter dated September 20, 2004, SERS informed relator that the retirement board agreed with the recommendations of MAC to disapprove the application. The letter informed relator that she had 15 days from the date of the letter to appeal the decision.
 {¶ 18} 12. On September 30, 2004, SERS received a written appeal from relator.
 {¶ 19} 13. By letter dated October 1, 2004, SERS informed relator that she had until December 19, 2004, to submit additional evidence in support of her appeal. Relator was further advised that MAC would review any additional evidence and advise the retirement board of its findings.
 {¶ 20} 14. By letter dated December 29, 2004, SERS informed relator that SERS had not received additional evidence by the December 19, 2004 deadline. The letter further advised:
 If you can establish that your medical condition(s) has progressed, a new application may be submitted. * * *
 * * * [T]he information that we received after December 19, 2004, can be considered on your re-application. Please find enclosed the necessary forms to re-apply.
 {¶ 21} 15. Earlier, on December 21, 2004, SERS received 33 pages of documents from relator. Among the documents was a "Functional Capacity Evaluation Summary Report" ("FCE") dated November 22, 2004. The FCE report, authored by physical therapist Marilyn Siegel concludes: *Page 10 
 In the absence of a clear occupation, an assessment of Ms. Boyd's tolerance for general work tasks was performed so that the results of the FCE would be applicable across a broad range of occupational settings. Relative to general work tasks, Ms. Boyd demonstrated the following tolerances: 1) Lifting was performed at a sedentary level. Patient was unwilling to perform multiple repetitions due to increased pain. 2) Sitting tolerance was of an occasional basis[.] 3) Standing and walking were at a sedentary level. [4)] Difficulty with prolonged standing and reaching. [5)] Grip strength was strong bilaterally.
 {¶ 22} 16. Also among the documents received by SERS on December 21, 2004, were three pages of "discharge instructions" dated September 5, 2003 from the Cleveland Clinic Foundation — Emergency Department. The discharge instructions indicate that relator had been treated for congestive heart failure on an emergency basis on September 5, 2003.
 {¶ 23} 17. Most of the documents received by SERS on December 21, 2004, were office notes from Dr. Waldbaum.
 {¶ 24} 18. On May 6, 2005, relator filed her second application for disability retirement benefits. In support of her application, Dr. Waldbaum completed an Attending Physician Report dated May 2, 2005, on which he certified that relator "is physically and/or mentally incapacitated for a period of at least the next 12 months and is unable to perform the duty for which [she is] formerly responsible as a school employee." (Emphasis sic.) For the primary disabling condition, Dr. Waldbaum listed only "Lumbar sprain" with a January 2002 onset date. He also listed the underlying medical conditions as "Lumbar DDD[,] Sacroiliac J[oin]t dysfxn[,] shoulder contusion."
 {¶ 25} 19. During May 2005, three MAC physicians received the reapplication
and each authored a report to the MAC chairman. Each of the three physicians *Page 11 
recommended that relator not be reexamined by a board appointed physician and that her reapplication be denied.
 {¶ 26} 20. By letter dated June 10, 2005, the MAC chairman informed the retirement board that MAC recommends that relator's reapplication be denied.
 {¶ 27} 21. By letter dated June 27, 2005, SERS informed relator that the retirement board had denied relator's reapplication.
 {¶ 28} 22. On January 26, 2006, relator filed a third application for disability retirement. The third application was mailed to SERS via a cover letter from relator's counsel dated January 23, 2006. Over the next two months, relator's counsel mailed additional documents to SERS in support of the third application.
 {¶ 29} 23. Earlier, on May 26, 2005, relator underwent an MRI of the lumbar spine. The MRI report prepared by Peter Franklin, M.D., states:
 L4-5: Disc desiccation with mild loss of disc space height and endplate spondylosis. There is an annular bulge without focal protrusion. There is moderate bilateral facet arthrosis and mild ligamentous hypertrophy. Normal central canal. Lateral recesses and intervertebral neural foramina.
 L5-S1: Normal disc height and disc hydration without endplate spondylosis. There is no annular bulge or protrusion. Normal central canal, lateral recesses and intervertebral neural foramina. There is moderate bilateral facet arthrosis.
 * * *
 IMPRESSION:
 L4-5 spondylosis and annular bulge.
 L5-S1 spondylosis. *Page 12 
 {¶ 30} 24. The May 26, 2005 MRI report was submitted with relator's third application filed with SERS on January 26, 2006.
 {¶ 31} 25. The disability retirement application also includes a "Job Duty Form" that the applicant is required to complete.
 {¶ 32} The "Job Duty Form" provides five sections for the applicant to complete. Section three, captioned "Medical Data" requires the applicant to state the "medical basis for application." In response, relator wrote: "congestive heart failure[,] L4-5 spondylosis [and] annular bulge, L5-S1 spondylosis." None of these conditions had ever been listed by relator on any of her previous applications.
 {¶ 33} 26. Relator submitted three attending physician reports from Dr. Waldbaum in support of her third application. Two of those attending physician reports are dated February 8, 2006. The other attending physician report is dated March 6, 2006. On two of the reports, Dr. Waldbaum lists "lumbar sprain" as the primary disabling condition. For the underlying medical conditions, Dr. Waldbaum lists "Lumbar DDD[,] Sacroiliac J[oin]t dysfxn[,] shoulder contusion." On one of the attending physician reports dated February 8, 2006, Dr. Waldbaum failed to list the primary disabling condition or the underlying medical conditions.
 {¶ 34} 27. On March 13, 2006, SERS received from relator's counsel approximately 100 pages of medical records from Kaiser Permanente of Ohio. The records are dated from January 2004 through March 2005.
 {¶ 35} 28. Relator also submitted a "School Bus Driver Medical Examination Record" that was completed by relator and an examining physician on January 10, *Page 13 
2006. On this document, the physician certifies that relator fails to meet the medical requirements for school bus drivers.
 {¶ 36} 29. Relator's third application prompted SERS to obtain reviews from Timothy J. Fallon, M.D., Marc Cooperman, M.D., and Charles F. Wooley, M.D., who comprise the MAC for relator's third application.
 {¶ 37} 30. On March 31, 2006, Dr. Cooperman wrote:
 On January 26, 2005 Ms. Boyd filed a second re-application for disability retirement based on lumbar sprain. She is currently 51 years old.
 Ms. Boyd reports ongoing back pain. She reports that this is aggravated by riding in a bus or in a Jeep, which she attempted to try to simulate her activities at work. She attempted to return to work, but apparently was unable to pass the physical examination. A MRI of the lumbar spine on May 26, 2005 showed L4-5 spondylosis and an annular bulge, and L5-S1 spondylosis. Interarticular facet joint injections were performed on July 22, 2005 and September 13, 2005.
 It is my opinion that a re-evaluation by a board appointed physician should be performed. It has been two years since Dr. Wolfe performed an independent medical examination. She has had ongoing back problems with multiple physician visits and facet injections. More importantly, she apparently has not been able to pass the required physical examination when she attempted to return to work. Therefore I think that an independent objective examination is warranted.
 {¶ 38} On March 30, 2006, Dr. Fallon wrote:
 I have had an opportunity to review the information provided in regards to the re-application for disability retirement of Theresa Boyd. This 51-year-old bus driver indicates a basis for disability as being a lumbar sprain.
 I did review the information that had been provided in regards to her initial claim for disability and also my review letter of August of 2004. At that time she had been evaluated *Page 14 
by Dr. Claire Wolfe, a physiatrist, for an independent medical evaluation and I did review that report. I also reviewed the job description and job duty form.
 I also reviewed my correspondence of May of 2005 in regards to her re-application.
 I again reviewed the job duty form that she had filled out as well as the job description from Cleveland Municipal Schools for school bus driver.
 Additional information included Dr. Waldbaum's report, and he is her attending physician. He noted spondylosis and facet arthrosis on MRI. He indicates this is a work-related injury. He included his office notes, which were reviewed.
 Dr. Waldbaum's attending physician report of March 2006 indicates that she had had facet injections, right and left, at L4-5 and L5-S1. The MRI of May 26, 2005 was reviewed and this showed spondylosis at L4-5 and L5-S1, as well as annular bulge. The functional capacity report was reviewed.
 Following my review of the additionally submitted information, I am not finding evidence of progression of this condition, and re-evaluation would not be indicated.
 {¶ 39} 32. On April 2, 2006, Dr. Wooley wrote:
 Upon review of the entire application #3 for disability retirement I did not find additional objective medical information to support progression, permanent disability, or warrant a re-examination by a board appointed physician.
 {¶ 40} 33. On April 17, 2006, Dr. Fallon wrote:
 The Medical Advisory Committee for School Employees Retirement System met in a special session on April 17, 2006 and discussed at length the re-application for disability benefits of Theresa Boyd. She is a 51-year-old bus driver who had indicated lumbar sprain as being disabling.
 We reviewed the additional information from Dr. Waldbaum. We noted treatment with facet injections and her MRI which had revealed lumbar spondylosis and annular bulging. *Page 15 
 Following discussions, it was the unanimous conclusion that there was not sufficient evidence presented that would substantiate progression of her condition, and re-evaluation was not indicated.
 {¶ 41} 34. On April 17, 2006, Dr. Cooperman wrote:
 On January 26, 2005 Ms. Boyd filed a second re-application for disability retirement based on lumbar sprain. She is currently 51 years old.
 Ms. Boyd reports ongoing back pain. She reports that this is aggravated by riding in a bus or in a Jeep, which she attempted to try to simulate her activities at work. She attempted to return to work, but apparently was unable to pass the physical examination. A MRI of the lumbar spine on May 26, 2005 showed L4-5 spondylosis and an annular bulge, and L5-S1 spondylosis. Interarticular facet joint injections were performed on July 22, 2005 and September 13, 2005.
 It was unanimously determined by the Medical Advisory Committee that there has been no progression of Ms. Boyd's medical condition and that there is no indication for a repeat examination at this time.
 {¶ 42} 35. On April 18, 2006, Dr. Wooley wrote:
 Following review of the job description, the medical records, and the Medical Examiner's evaluations, the Medical Advisory Committee did not find additional objective medical information to support progression, permanent disability, or warrant a re-examination by a board appointed physician.
 {¶ 43} 36. By letter dated April 28, 2006, the chairman informed the retirement board that MAC recommends that relator's third application be denied.
 {¶ 44} 37. By letter dated May 22, 2006, SERS informed relator that the retirement board had denied the third application.
 {¶ 45} 38. On September 14, 2006, relator, Theresa Boyd, filed this mandamus action. *Page 16 
Conclusions of Law: {¶ 46} Several issues are presented: (1) did SERB abuse its discretion by relying upon the report of Dr. Wolfe? (2) did SERB abuse its discretion in denying relator's second application for disability retirement? (3) did SERB abuse its discretion in denying relator's third application for disability retirement? and (4) did SERS abuse its discretion when MAC met in a "special session" on April 17, 2006?
 {¶ 47} The magistrate finds: (1) SERB did not abuse its discretion by relying upon the report of Dr. Wolfe; (2) SERB did not abuse its discretion in denying relator's second application for disability retirement; (3) SERB did not abuse its discretion in denying relator's third application for disability retirement; and (4) SERS did not abuse its discretion when MAC met in a "special session" on April 17, 2006.
 {¶ 48} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 49} Turning to the first issue, Dr. Wolfe's report states in part:
 Mrs. Boyd was contracted for 7 hours 40 minutes a day for driving a school bus. She usually drove for 2.5 hours in the morning, was off for 3 hours in between and then drove for another 3 hours at the end of the day. * * *
 {¶ 50} According to relator, this court must read the above-quoted portion of Dr. Wolfe's report to indicate that Dr. Wolfe misunderstood relator's job duties as a school bus driver. According to relator, the report indicates that Dr. Wolfe believed that relator worked for only two and one-half hours in the morning and three hours at the end of the school day and thus only worked five and one-half hours rather than the seven hours *Page 17 
and 40 minutes that she contracted for. The magistrate disagrees with relator's argument.
 {¶ 51} The magistrate finds State ex rel. Clark v. Indus. Comm.
(1995), 72 Ohio St.3d 377, a case involving workers' compensation, to be helpful, if not instructive, on the issue here.
 {¶ 52} In Clark, at 379, the court applied a legal principle fromState ex rel. Braswell v. Indus. Comm. (1986), 25 Ohio St.3d 61, 63:
 "[A] physician conducting a medical examination, where the claimant seeks temporary total disability benefits, should, in most cases, possess some knowledge of the physical requirements associated with the former position of employment[.] [W]e deem it unnecessary for the physician to trace, in detail, every physical movement necessitated during the average workday." * * *
 {¶ 53} The issue in Clark was whether Dr. Dobrowski's report satisfiedBraswell. In his report, Dr. Dobrowski opined that the claimant "could return to his previous position as a construction worker." Id. at 378. He also noted that the claimant was injured "pushing an air compressor." Id. Concluding that Dr. Dobrowski's report satisfied Braswell, theClark court states, at 380:
 Claimant responds that "construction worker" is too general a term, claiming that it encompasses many different duties entailing many different levels of physical exertion. While this may be true, there is no evidence that Dr. Dobrowski misperceived claimant's duties to the detriment of any interested party. There is no indication that Dr. Dobrowski based his conclusion on the erroneous belief that claimant's occupation consisted of sedentary, light or medium work. To the contrary, Dr. Dobrowski noted that claimant was injured while pushing an air compressor — a heavy piece of machinery. Accordingly, we find that the report was "some evidence" supporting the commission's decision. *Page 18 
 {¶ 54} To begin, while Dr. Wolfe was required to indicate in her report that she possesses some knowledge of the physical requirements of the job of a school bus driver, it is unnecessary that she exhaustively list all the duties and responsibilities of the job. There is no question here that Dr. Wolfe understood that she was examining relator on August 10, 2004, to determine whether relator is able to perform her job as a school bus driver.
 {¶ 55} In her report, Dr. Wolfe noted that relator told her that when she tried returning to work she found that the constant sitting and vibration simply made her pain unbearable. Thus, Dr. Wolfe's report is focused on the aspects of the job that relator herself reported to be troublesome for her.
 {¶ 56} Contrary to relator's claim here, Dr. Wolfe's report does not show that Dr. Wolfe mischaracterized the duties of the job of school bus driver. Dr. Wolfe states that relator drove for two and one-half hours in the morning and then drove for another three hours at the end of the day. Relator does not dispute the accuracy of this statement. However, relator claims that Dr. Wolfe's statement that relator "was off for 3 hours in between" must be interpreted that Dr. Wolfe believed that relator had no job responsibilities during the three-hour period between her operations of the school bus. In the magistrate's view, Dr. Wolfe's report, read in its entirety, does not support relator's claim. Dr. Wolfe's reporting that relator was contracted for seven hours and 40 minutes a day dispels relator's claim. Accordingly, SERB did not abuse its discretion when it relied upon Dr. Wolfe's report to deny relator's disability retirement application. *Page 19 
 {¶ 57} Turning to the second issue, on May 6, 2005, relator filed a second application for disability retirement benefits. Earlier, by letter dated December 29, 2004, SERS had informed relator that the information SERS had received after the December 19, 2004 deadline on the first application would be considered if relator reapplied. The December 29, 2004 SERS letter also advised relator that she must establish that her medical conditions have progressed on the reapplication.
 {¶ 58} Among the documents received by SERS prior to December 29, 2004, was the November 22, 2004 FCE.
 {¶ 59} Ohio Adm. Code 3309-1-41(C) states:
 Any future applications for disability benefits filed after a denial of appeal must be submitted with medical evidence supporting progression of the former illness or injury or evidence of a new illness or injury. If such evidence is evaluated by the medical advisory committee and found to be inadequate to establish the progression of the former illness or injury or the existence of a new illness or injury, the application shall be voided.
 {¶ 60} Ohio Adm. Code 3309-1-41 states:
 The following procedures will govern in cases of a member's appeal of a denial of disability benefits[.] * * *
 * * *
 (2) (a) The member may appeal a decision to deny or terminate disability benefits within fifteen days of the date on the notice of denial or termination by filing a notice of intent to appeal such decision and by providing additional evidence. * * *
 * * *
 (d) "Additional evidence" means evidence that is current and pertinent to the illness or injury for which the disability was claimed and that has not been submitted before. *Page 20 
 {¶ 61} Citing Ohio Adm. Code 3309-1-41(A)(2)(d), relator claims that the November 22, 2004 FCE constitutes additional evidence that warrants reexamination by a board appointed physician. (Relator's brief, at 10.)
 {¶ 62} Relator's reliance upon Ohio Adm. Code 3309-1-41 is misplaced. As respondent here correctly points out, the second application filed on May 6, 2005, was not an appeal of a decision denying an application. As respondent here correctly points out, Ohio Adm. Code 3309-1-41(C) is applicable.
 {¶ 63} Thus, the [issue] before SERS upon relator's second application for disability retirement benefits was whether the medical evidence supported progression of the former injury or evidence of a new injury. Relator suggests that the medical evidence supported progression of the former injury. According to relator, the November 22, 2004 FCE shows progression because the physical therapist who prepared the FCE concluded that relator was limited to sedentary employment while the school bus driver job requires medium level exertion.
 {¶ 64} As previously noted, during May 2005, three MAC physicians reviewed the reapplication and each authored a report to the chairman. Each of those three physicians found a lack of progression based upon a review of the submitted medical records. Based upon those three MAC reports, the chairman recommended that relator's reapplication be denied. SERB agreed with the recommendation.
 {¶ 65} Relator's argument here is, in effect, an invitation that this court reweigh the medical evidence for SERS and reach a conclusion favorable to relator. This court does not reweigh the evidence for SERS in mandamus. *Page 21 
 {¶ 66} It is clear that the three MAC physicians applied the correct standard under Ohio Adm. Code 3309-1-41(C) and reached a conclusion unfavorable to relator. Presumably, the three MAC physicians reviewed the November 22, 2004 FCE authored by the physical therapist and found it unpersuasive. Relator is not entitled to a de novo review of the medical records by this court.
 {¶ 67} The third issue is whether SERB abused its discretion in denying relator's third application for disability retirement benefits filed January 26, 2006.
 {¶ 68} Relator claims that the results of the May 26, 2005 MRI and the evidence of congestive heart failure required a reexamination by an examining physician appointed by SERS. The magistrate disagrees.
 {¶ 69} Ohio Adm. Code 3309-1-40(A)(5) states:
 "Examining physician(s)" means the disinterested physician(s) assigned by the system or the chairman of the medical advisory committee to conduct medical examinations of a disability applicant or recipient to determine eligibility to obtain or continue to receive disability benefits.
Ohio Adm. Code 3309-1-40(B) states:
 The school employees retirement board shall appoint a minimum of three members to the medical advisory committee who shall be physicians who demonstrate a wide range of competent medical experience, and a chairman for the medical advisory committee who shall act as medical advisor to the board. The chairman shall have authority and responsibility to assign competent and disinterested physicians to conduct medical examinations of disability applicants and recipients for the purpose of determining the member's eligibility to obtain and continue to receive disability benefits, to recommend and review medical treatment, to certify a disability as ongoing and to submit to the board a recommendation to accompany the report of the medical examiner and/or the medical advisory committee. *Page 22 
 {¶ 70} As respondent correctly points out, while Ohio Adm. Code3309-1-40 provides for a first time applicant to be examined by an SERS physician, it does not specifically require reexamination upon reapplication. (Respondent's brief, at 13.) Moreover, Ohio Adm. Code3309-1-41(C) does not specifically require reexamination upon reapplication.
 {¶ 71} However, Ohio Adm. Code 3309-1-40(B) gives the chairman the authority and responsibility to assign competent and disinterested physicians to conduct medical examinations of disability applicants. Presumably, Ohio Adm. Code 3309-1-40(B) gives the chairman the discretion to have the applicant reexamined in appropriate cases.
 {¶ 72} It is clear under the circumstances of this case, that the chairman did not abuse his discretion by failing to have relator reexamined following her third application.
 {¶ 73} R.C. 3309.39(B) provides that an application for disability retirement "shall be made on a form provided by the retirement board." The Attending Physician Report which is part of the disability application, specifically provides:
 * * * The Retirement Board requires a general summary of the applicant's physical and/or mental condition as a guide in selection of the medical examiner as required by law (O.R.C. 3309.39). The examiner will only evaluate for the medical condition(s) that are included in your report. Please list only the medical condition(s) that are considered disabling. * * *
 {¶ 74} Significantly, in support of the third application, Dr. Waldbaum certified "lumbar sprain" as the primary disabling condition. For the underlying medical conditions, Dr. Waldbaum listed "Lumbar DDD[,] Sacroiliac J[oin]t dysfxn[,] shoulder contusion" *Page 23 
 {¶ 75} Dr. Waldbaum's certification contrasts with the conditions that relator herself listed as the "medical basis for application." Again, relator wrote on her third application: "congestive heart failure. L4-5 spondylosis [and] annular bulge, L5-S1 spondylosis." SERS was not required to examine for or evaluate conditions that relator's own physician failed to certify on the attending physician reports submitted in support of the third application. Clearly, Dr. Waldbaum did not certify the conditions that relator claims compel a reexamination by a SERS appointed physician.
 {¶ 76} The fourth issue is whether SERS abused its discretion when MAC met in a "special session" on April 17, 2006, to discuss at length relator's third application.
 {¶ 77} It is apparent from reading Dr. Cooperman's March 31, 2006 report that Dr. Cooperman changed his mind that a reevaluation by a board appointed physician should be performed. Apparently, Dr. Cooperman changed his mind at the April 17, 2006 special session.
 {¶ 78} Relator suggests that it was improper for MAC to meet in a "special session" on April 17, 2006. According to relator:
 * * * In the absence of any evidence to the contrary, this court is entitled to assume that Dr. Cooperman was pressured into changing his statement by the other doctors on the Medical Advisory Committee.
(Relator's brief, at 13.) The magistrate disagrees with relator's argument.
 {¶ 79} Relator fails to cite any statute, rule, or case prohibiting a medical advisory committee meeting to discuss an application that is before them. Here, it appears that initially each physician separately evaluated the reapplication in light of the evidence submitted and rendered a report. Thereafter, because there was disagreement, a *Page 24 
meeting was held and Dr. Cooperman changed his opinion. There is no evidence in the record of any undue influence toward Dr. Cooperman. Relator is incorrect in asserting that this court must conclude that Dr. Cooperman was "pressured" in the absence of any evidence in the record to support this assertion.
 {¶ 80} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1